IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| GLEN STEWART, ET AL, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | CIVIL ACTION NO. |
| v. | § | 3:10-CV-2275-P |
| | § | |
| AMERICAN EAGLE AIRLINES, INC., | § | |
| ET AL, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Now before the Court are (1) Plaintiffs' motion for summary judgment (Docket #89); (2) Defendant Allied Pilots Association's motion for summary judgment on its cross-claim (Docket #142, *refiled as* Docket #153-1); and (3) Defendants American Airlines, Inc., American Eagle Airlines, Inc., and Air Line Pilots Association, International's motion to dismiss (Docket #148). After reviewing the Parties' briefing, the evidence, and the applicable law, the Court hereby DENIES Plaintiffs' motion for summary judgment (Docket #89), DENIES Defendant Allied Pilots Association's motion for summary judgment on its cross-claim (Docket #142 *refiled as* Docket #153-1), and GRANTS American Airlines, Inc., American Eagle Airlines, Inc., and Air Line Pilots Association, International's motion to dismiss (Docket #148).

**A.      The Parties.**

Defendant American Eagle Airlines, Inc. ("Eagle" or "AE") is a subsidiary of Defendant American Airlines, Inc. ("American" or "AA"). Defendant Air Line Pilots Association ("ALPA")

is the collective bargaining agent for the Eagle pilots. Defendant Allied Pilots Association ("APA") is the collective bargaining agent for the American pilots.

Plaintiffs are former Trans World Airlines ("TWA") pilots. American acquired TWA in 2001. Plaintiffs were then furloughed by American following the events of September 11, 2001. Plaintiffs are represented by APA under its collective bargaining agreement with American.

**B.     The Flow-Through Agreement.**

In 1997, ALPA, APA, Eagle, and American negotiated a four-party collective bargaining agreement known as the Flow-Through Agreement. The Flow-Through Agreement allowed Eagle pilots to "flow-up" to American when American was hiring new pilots. It also allowed American pilots to "flow-down" to Eagle during pilot furloughs at American. The Flow-Through Agreement is attached to this order as Exhibit A.

**C.     Events of 2001.**

In 2001, American acquired the assets of TWA in bankruptcy. (Docket #63 ¶12.) In November 2001, APA and American entered into a seniority integration agreement to combine the TWA and American pilot seniority lists, known as Supplement CC. (Docket # 80 ¶6; Docket #144 at 9; Docket # 145 at 971.) In March 2002, during TWA's transition to American, the National Mediation Board determined that American and TWA were a "single carrier," which meant the former TWA pilots were subject to the American/APA collective bargaining agreement ("CBA"). (Docket #63 ¶13.)

In the midst of this merger, the terrorist attacks of September 11, 2001 occurred. In the wake of 9/11, the airline industry suffered significantly and American had to lay off, or "furlough", many of the former TWA pilots, including Plaintiffs. (Docket #63 ¶15.)

**D.      The Underlying Arbitrations.**

In 2003, a dispute arose between American, Eagle, APA and ALPA as to whether the former TWA pilots who had been furloughed before they ever began flying at American should be treated as "new hires" for purposes of the Flow-Through Agreement. The Flow-Through Agreement states that at least one of every two "new hire" positions per "new hire" class at American will be offered to Eagle captains in order of seniority. Arbitrator John LaRocco ("LaRocco") was assigned the case and resolved it in 2007. LaRocco held that these former TWA pilots should be treated as "new hires" under the Flow-Through Agreement.

In 2007, American began its recall of several hundred furloughed former-TWA pilots. (Docket #63 ¶16.) LaRocco issued his remedy award in October 2008, awarding AA seniority numbers to 154 Eagle pilots in order to compensate for the 154 former-TWA-"new hire" pilots who had been recalled to American as of the date of the remedy hearing (April 24, 2008). LaRocco explicitly held he did not have jurisdiction, based on the grievance, to decide whether any Eagle flow-through pilots were entitled to attend training classes at American beginning in June 2007.

In March 2008, the Parties submitted to arbitration the outstanding issue of whether Eagle pilots with AA seniority numbers were entitled to attend training classes at American beginning in June 2007, when American began to recall former-TWA-"new hire" pilots. The dispute was assigned to Arbitrator George Nicolau ("Nicolau"), who held that the Eagle pilots with AA seniority numbers were entitled to attend training classes. He issued a remedy order allowing, *inter alia*, certain Eagle pilots the opportunity to flow-up to American and allowing certain Eagle pilots with seniority numbers to attend training classes.

In May 2010, the former-TWA-pilot Plaintiffs filed a declaratory judgment action in the Middle District of Tennessee,[1] asking the Court to set aside Nicolau's decision because they were not given notice of and did not attend the arbitration hearing, in violation of the Railway Labor Act ("RLA"), 45 U.S.C. § 153(j). (Docket #63.)  APA filed a cross-claim in November 2010 against Eagle, American, and ALPA, in which it argues the Nicolau arbitration decision(s) should be set-aside because he exceeded his own jurisdiction.  (Docket #80.)

## DISCUSSION

### A.   Plaintiffs' Declaratory Judgment Action and Their Motion for Summary Judgment.

Plaintiffs seek to vacate Nicolau's arbitration award based on lack of notice.  (Docket #90 at 1.)  They maintain they were not aware of the proceeding(s) and did not attend the hearings. (Docket #63 ¶24.)  They argue they were entitled to personal notice of the proceedings because they are not APA members and were not represented by APA during the proceedings.  (Docket #90.)

APA does not oppose Plaintiffs' motion for summary judgment and acknowledges it did not give notice of the proceedings to the APA-represented pilots.  (Docket #121.)  However, APA does acknowledge it is the representative of the furloughed-TWA pilots.   (Docket #122-1 at 2.) Defendants American, Eagle, and ALPA move to dismiss Plaintiffs' complaint because personal notice is not required when a union representative is notified of the proceedings.

The Railway Labor Act mandates that airline employees involved in a dispute are entitled to notice of all hearings.  "Parties may be heard in person, by counsel, or by other representatives, as they may respectively elect, and the [Board] shall give due notice of all hearings to the employees and the carrier or carriers involved in any disputes submitted to them." 45 U.S.C. § 153(j).  In 2007,

---

[1]  The case was transferred to this Court on November 10, 2010.

the Fifth Circuit plainly stated in *Mitchell v. Cont'l Airlines, Inc.,* that notice to a union representative when an employee is represented by his collective bargaining representative satisfies the notice requirement under the RLA. *Mitchell v. Continental Airlines, Inc.,* 481 F.3d 225, 232 (5th Cir. 2007). Similarly, the Fifth Circuit held years earlier that an arbitration board "is obligated to notify an employee *(or his representative)* of any proceeding that may result in that employee's losing his position." *Bhd. of Ry., Airline, and S.S. Clerks, Freight Handlers, Express & Station Emps. v. St. Louis SW Ry. Co.,* 676 F.2d 132, 136 (5th Cir. 1982). Plaintiffs try to distinguish this case from *Mitchell* and others by emphasizing factual differences and by characterizing the holding as *dicta.* However, the Fifth Circuit unambiguously stated that "the Board was not required to provide [the individual] with personal notice of the . . . hearing. As a flight attendant and thus a subscriber to the CBA, [the individual] had authorized the [union] to act exclusively on her behalf. Thus, as the district court correctly recognized, notice to the [union] − [the individual's] representative − constituted adequate notice to [the individual] and all similarly-situated employees who had not filed individual grievances." *Mitchell,* 481 F.3d at 232. The Court is bound to this precedent and has not been given any compelling reason to hold otherwise.

The Court rejects Plaintiffs' repeated, but unsupported, contention they are not represented by APA. (Docket # 154 at 3-4.) The National Mediation Board determined in 2002 that American and TWA were a "single carrier" for purposes of the RLA and union representation. (Docket #63 ¶13.) This "single carrier" determination meant the former TWA pilots were subject to American's collective bargaining agreement with APA, its pilots' union. (Docket #63 ¶13.) APA was certified as the former-TWA-pilots' representative. (Docket #150-6, 150-7.) Further, as American "new hires," those former-TWA pilots were represented by APA at the arbitration. APA argued its case

before Nicolau on Plaintiffs' behalf and even presented testimony of three similarly-situated former-TWA pilots. (Docket #145 at 995.)

For these reasons, the Court finds that notice to APA of the arbitration proceedings constituted notice to Plaintiffs. Accordingly, the Court hereby GRANTS Defendants American Airlines, American Eagle and the ALPA's motion to dismiss Plaintiffs' declaratory judgment claim to set aside the arbitration award (Docket #148) and DENIES Plaintiffs' motion for summary judgment (Docket #89). Plaintiffs' Complaint is hereby DISMISSED with PREJUDICE.

## B.    APA's Cross-claim.

In November 2010, APA (the American pilots' collective bargaining agent) filed a cross-claim seeking to have the Nicolau arbitration award vacated because he exceeded the scope of his jurisdiction by awarding the training class seats to Eagle pilots in contravention of the LaRocco award, which awarded seniority numbers.    (Docket #80.)    APA filed a motion for summary judgement on its cross-claim. (Docket #142.) Defendants American, Eagle, and ALPA moved to dismiss APA's cross-claim. (Docket #148.)

To resolve these motions, the Court must delve into the facts that form the bases of the LaRocco and Nicolau arbitration awards. Both arbitrations arose out of a provision in the Parties' collective bargaining agreement (or Flow-Through Agreement) known as Supplement W in the APA/American CBA and Letter 3 in the ALPA/Eagle CBA ("Supplement W/Letter 3"). Supplement W/Letter 3 was negotiated in 1997 to try to align the interests of the ALPA commuter pilots at Eagle with the APA-represented pilots at American by allowing certain Eagle pilots to flow up to American in the event of hiring at American and, in the event of a furlough, allowing certain American pilots to flow down into certain positions at Eagle. (Docket #80 ¶ 3.) Supplement

W/Letter 3 expired on May 1, 2008. (Docket # 144 at 8.) The relevant provisions of Supplement W/Letter 3 are attached as Exhibit A to this order.

In January 2001, American entered into an agreement to purchase the assets of TWA, which had declared bankruptcy. (Docket #80 ¶4.) In February 2001, TWA LLC was established as a transition entity that would operate the debtor airline while its aircraft and operating procedures were being modified to conform to American. (Docket #80 ¶4.) On April 10, 2001, American took control of TWA LLC. (Docket #80 ¶4.) In November 2001, APA sought to have TWA LLC and American declared a single airline. (Docket #80 ¶5.) In March 2002, the National Mediation Board declared the two airlines a single entity for labor relations purposes. (Docket #80 ¶5.) Accordingly, on April 3, 2002, APA became the representative of the TWA LLC pilots. (Docket #80 ¶5.)

On November 8, 2001, APA and American entered into a seniority integration agreement to combine the pilot seniority lists of TWA LLC and American, known as Supplement CC. (Docket #80 ¶6.) Supplement CC provided that 1,095 former TWA pilots would be integrated into the AA pilot seniority list. (Docket #80 ¶7.) The remaining former TWA pilots were integrated in a block in front of 382 American pilots with later hire dates. (Docket #80 ¶7.) According to APA's cross-claim, ALPA was not involved in the discussions about TWA pilot integration because "all the parties to Supplement W/Letter 3 understood that a merger was different from a new hiring." (Docket #80 ¶7.)

Following the September 11, 2001 attacks, AA began to furlough pilots. (Docket #80 ¶8.) The furloughs continued through April 2005. (Docket #80 ¶8.) More than a thousand former-TWA-pilots were furloughed – some were furloughed directly from American and some, who had not yet

7

made the technical transition to flying on the American operating certificate,[2] were furloughed directly from TWA LLC. (Docket #80 ¶8.)

## 1. The LaRocco Arbitration.

In November 2003, the Eagle pilots' collective bargaining agent, ALPA, filed a grievance based on Section III.A. of Supplement W/Letter 3 which states: "At least one (1) out of every two (2) new hire positions per new hire class at AA will be offered to [Eagle] CJ[3] Captains . . ." (Docket # 144 at 6.) ALPA contended the former-TWA pilots should be considered "new hires" in "new hire classes" when they transitioned to American and therefore, half the new pilot jobs should go to Eagle captains in the form of AA seniority numbers. (Docket # 144 at 10.) In other words, Eagle pilots are entitled to one out of two American job opportunities (seniority numbers) generated at American by the former-TWA-"new hire" pilots. (Docket # 144 at 11; 145-6 at 41.)

APA argued the former-TWA pilots were not "new hires" – rather, they were effectively American pilots as a consequence of the merger. Therefore, Section III.A., which dealt with "new hire positions" did not apply in this case and the Eagle captains are not entitled to half of the jobs created by the merger. (Docket # 144 at 12.)

The two issues before LaRocco were (1) whether the former-TWA pilots on the AA seniority list filled or may fill "new hire" positions in "new hire" classes within the meaning of Section III.A. and, if so, (2) what is the appropriate seniority number remedy for Eagle CJ Captains covered by Letter 3/Supplement W? (Docket # 145-20 at 972). At that time, no TWA pilot had attended an AA

---

[2] The FAA requires any airline intending to operate as a commercial carrier for hire to have an operating certificate. Air carriers must meet certain statutory requirements in order to obtain and hold a certificate authorizing operations. *See generally* 14 C.F.R. § 119.1.

[3] CJ stands for commuter jet. (Docket #145 at 41.)

training class.  (Docket # 145-20 at 972).  That did not occur until June 6, 2007.  (Docket # 145-20 at 972.)

In 2007, American began recalling pilots, many of whom were the furloughed former-TWA pilots.  (Docket # 144 at 10.)

In May 2007, LaRocco rendered his decision.  He found that Section III.A. did not apply to merger-related positions.  However, he differentiated between TWA pilots who had entered active service with American and those who had been furloughed directly from TWA-LLC.  (Docket #145 at 972.)  He found that those former-TWA-pilots who had assumed active employment at AA were not "new hire" pilots under Section III.A.  (Docket #145 at 972.)  By contrast, he found that the other TWA pilots – those who were flying with TWA LLC at the time they were furloughed – were considered "new hires" when recalled to AA because their positions were no longer merger-related. (Docket #145 at 525 *et seq.*)

At the Parties' request, LaRocco remanded the remedy issue to them for possible resolution. When an agreed remedy could not be reached, LaRocco held a hearing in April 2008.  Between the time LaRocco entered his liability ruling in May 2007 and the remedy phase in April 2008, TWA-"new hire" pilots began entering America training classes (beginning in June 2007).

LaRocco's remedy decision was issued on October 20, 2008.  (Docket #145 at 575 et *seq.*) He recognized that as of the April 24, 2008 hearing date, 154 TWA "new hire" pilots had attended AA training.  He concluded that pursuant to Section III.A., Eagle flow-through captains should have filled at least one out of every two of those positions.[4]  Arbitrator LaRocco's award specifically held

---

[4] A "Flow Through Captain" is an Eagle regional jet captain who has elected to go to American in the event of American hiring.  (Docket #80 ¶3.)  An Eagle captain who declines the opportunity to "flow-through" to American is known as an "Eagle Rights CJ Captain".

that the 154 former-TWA pilots recalled prior to his ruling should generate 154 seniority numbers for Eagle flow-through captains. (Docket #145 at 604-05.) LaRocco also held that the seniority numbers for those flow-through pilots "shall be the next 154 numbers after the most junior pilot on the AA seniority list." (Docket #145 at 605.)

LaRocco limited his ruling to the issue of seniority numbers because that was the issue stipulated by the parties for determination. (Docket #145 at 606-07.) Because his authority was limited to the seniority number issue, LaRocco expressly declined to resolve whether any flow-through Eagle pilots were entitled to seats in American training classes. (Docket #145 at 607.)

### 2. The Nicolau Arbitration.

After LaRocco's May 2007 liability opinion, ALPA submitted to another arbitrator, Arbitrator George Nicolau, the issue of whether "AE pilots holding AA numbers were entitled to attend AA training classes as of June 2007." (Docket #145 at 992.) ALPA and Eagle argued the training class slots should go to the Eagle flow-through captains with AA seniority numbers instead of the TWA "new hire" pilots. (Docket #145 at 967, 991.) APA argued that institution of the Nicolau arbitration was improper in light of the fact that ALPA had already sought and received a remedy from LaRocco. (Docket #145-20 at 975.)

Nicolau held a hearing in June 2009 and issued a liability decision in October 2009. (Docket #145 at 965 et seq.) Nicolau concluded that, in light of the LaRocco decision that characterized the TWA pilots as "new hires", the Flow-Through Agreement entitled Eagle pilots with AA seniority numbers to one of every two AA training class slots beginning in June 2007. (Docket #145 at 989.) He noted there had been twenty training classes at American between June 6, 2007 and March 18,

2009. Those classes had been attended by 244 TWA "new hire" pilots and no Eagle pilots. (Docket #145 at 967.)

After the Parties tried unsuccessfully to agree on a remedy, Nicolau addressed the remedy issue in an order dated April 9, 2010. Nicolau developed a multi-faceted plan to remedy a number of issues.

Nicolau held in his remedy order of April 9, 2010 that the 286 most senior Eagle captains holding AA seniority numbers should be given the opportunity to flow-up to American according to a prescribed timetable.[5] (Docket #145 at 1003, 1008.) Once elections are made, the opportunity to transfer to American shall be offered to the 244 most senior Eagle captains who elect the advancement. (Docket #145 at 1008.) The first 35 Eagle captains who choose to flow-up to American shall be placed in training classes beginning no later than June 2010. (Docket #145 at 1005.) Following that transfer, American must recall its furloughed American pilots based on seniority until the most junior American pilot furloughed has been offered recall.[6] (Docket #145 at 1006.) Following the offer and recall, the remaining Eagle pilots with AA seniority numbers who elected to transfer and those American pilots presently on furlough shall be entitled to enter and re-enter active service at American in seniority order. (Docket # 145-21 at 1006.) Of those Eagle captains who transfer, those who are in the 244 shall be entitled to receive compensation and benefits

---

[5] In other words, the choice to flow-up to American was given to 286 Eagle captains. This was the number of active Eagle captains who held seniority numbers above the least senior active TWA "new hire" pilot.

[6] In 2010 American instituted another furlough of pilots. Nicolau ruled that after the 35 Eagle pilots were transferred to American, no additional Eagle pilots would flow up to American until all of the 2010 furloughed American pilots were offered recall. He further held that once an offer of recall had been made to all the 2010 furloughees, the remaining Eagle captains who elect to transfer to American will be offered positions as they become available in the future. (Docket #149 at 8.)

11

as of the day they would have transferred had they been in one of the June 6, 2007 - March 18, 2009 training classes.

### 3. APA's Motion for Summary Judgment on its Cross-Claim and the Movant Defendants' Motion to Dismiss APA's Cross-Claim.

#### a. Parties' Positions.

Nicolau's remedy decision resolved the question of what to do with those Eagle pilots who should have been, but were not, in the training classes. It is this remedy decision the APA challenges. APA argues in its summary judgment briefing that Nicolau's jurisdiction arises from the Flow-Through Agreement, relying on the principle that an arbitrator "fails to conform or confine itself to its jurisdiction if it issues a decision that is contrary to an unambiguous provision of the CBA." *Cont'l Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 555 F.3d 399, 406 (5th Cir. 2009). APA asserts that Nicolau exceeded his jurisdiction by (1) violating the Flow-Through Agreement with respect to filling training classes; (2) establishing a Flow-Through Agreement-like mechanism after it had expired; and (3) failing to find the training-class issue barred by *res judicata* due to his misunderstanding of the facts. (Docket #144.) For these reasons, APA believes the Nicolau award should be vacated.

American, Eagle, and ALPA ("Movant Defendants") move under Rule 12(b)(6) to dismiss APA's cross-claim because APA has not satisfied the RLA's narrow standard for vacating an arbitration award. (Docket #149 at 1, 9 (quoting *Union Pac. R.R. Co. v. Sheehan*, 439 U.S. 89, 91 (1978) which held the scope of judicial review of an arbitration award under the RLA is "among the narrowest known to the law.").)

#### b. Discussion.

12

The RLA was enacted to promote stability in labor-management relations in the "important national" railroad industry. *Sheehan*, 439 U.S. at 94. Long ago, Congress extended the RLA to air carriers. 45 U.S.C. § 181.

The RLA provides for the creation of an Adjustment Board, which is charged with resolving "minor disputes" arising out of the interpretation of collective bargaining agreements. *Sheehan*, 439 U.S. at 94. "Congress considered it essential to keep these so-called 'minor disputes' within the Adjustment Board and out of the courts." *Id.* "The effectiveness of the Adjustment Board in fulfilling its task depends on the finality of its determinations." *Id.*

Accordingly, 45 U.S.C. § 153 First (q) allows for judicial review of arbitration awards in three narrow circumstances: (1) failure of the arbitration board to comply with the requirements of the RLA; (2) failure of the arbitration board to conform, or confine itself, to matters within the scope of its jurisdiction; and (3) fraud or corruption. *Sheehan*, 439 U.S. at 93.[7]

### i)  CBA Requirements for Filling Training Class Positions.

According to APA, Nicolau's award is "contrary to unambiguous provisions" of the CBA regarding the filling of training class positions and cannot be reconciled with the LaRocco award. (Docket #144 at 22.) The unambiguous provision to which APA refers (III.B) provides that an Eagle pilot is allowed an AA seniority number only when the Eagle pilot had the right to a seat in a training class but was not allowed to fill the seat due to an Eagle training freeze or other operational constraint. (Docket #144 at 22.) LaRocco awarded AA seniority numbers to Eagle pilots pursuant to III.A. which entitles Eagle pilots to one of every two new hire positions. Nicolau awarded training

---

[7] Courts have applied these restrictions on judicial review to the airline context, despite language in the RLA that says airlines are not subject to the provisions of § 153. 45 U.S.C. § 181.

slots pursuant to III.D, which provides priority for those who have AA seniority numbers under III.B. APA concludes that Nicolau and LaRocco effectively awarded two different groups of pilots the same training slots. According to APA, "If the III.D Eagle pilots had, in fact, occupied the training class seats beginning in June 2007, as awarded by Arbitrator Nicolau, there is no way under the terms of Supplement W/Letter 3 that AA seniority numbers could have been generated for III.A Eagle pilots, as awarded by Arbitrator LaRocco." (Docket # 44 at 23.) APA insists that Nicolau's remedy cannot be reconciled with LaRocco's remedy if you apply the precise terms of the CBA to the awards.

Defendants American, Eagle, and ALPA respond by arguing the Court should defer to Nicolau's "experience, perspective, and understanding of industrial practice in interpreting the Flow-Through Agreement and rendering his award." (Docket #157 at 10.) Defendants reconcile the awards by explaining that Nicolau believed the Eagle captains with comparatively senior AA seniority numbers deserved to attend the training classes at American between June 2007 and March 2009 instead of the former-TWA pilots with more junior AA seniority numbers, whereas LaRocco did not decide whether those senior Eagle pilots were entitled to attend training classes. His award was limited to the issue of generating seniority numbers. (Docket #157 at 11.)

A court must affirm an arbitral award if the arbitrator is "arguably construing or applying the contract and acting within the scope of his authority." *United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 38 (1987). If the arbitrator has not exceeded his authority, "the fact that a court is convinced he committed serious error does not suffice to overturn his decision." *Major League Baseball Players Ass'n v. Garvey,* 532 U.S. 504, 509 (2001). The Fifth Circuit has made clear that, a district court's review of an arbitrator's decision is "extremely deferential." *Nat'l Gypsum Co. v.*

*Oil, Chem. & Atomic Workers Int'l Union,* 147 F.3d 399, 401 (5th Cir.1998). When reviewing an arbitration award, a district court is particularly constrained. "As long as the arbitrator's decision 'draws its essence from the collective bargaining agreement' and the arbitrator is not fashioning 'his own brand of industrial justice,' the award cannot be set aside." *Weber Aircraft Inc. v. General Warehousemen and Helpers Union Local 767,* 253 F.3d 821, 824 (5th Cir. 2001); *see Teamsters Local No. 5. v. Formosa Plastics Corp.,* 363 F.3d 368, 371 (5th Cir. 2004).

During the course of these complex arbitrations, the Parties had difficulty stipulating to the question(s) presented to the arbitrators for decision. The arbitrators had to meet with the lawyers, and sort through complex contracts, testimony, and briefing about pilot seniority rights to identify and understand the particular claims. It is apparent that no solution to this seniority dispute could have satisfied all parties. When American acquired TWA – including its pilots – the Eagle pilots apparently had no part in the merger talks or agreements. Under the CC, the TWA pilots began acquiring seniority numbers and training class positions the Eagle pilots believed they were entitled to. No arbitrator could have satisfied both unions. Faced with the polarized positions of the two unions, LaRocco and Nicolau attempted to find the most reasonable – to them – of the several imperfect choices. Both LaRocco and Nicolau issued thoughtful, thorough, and detailed opinions and awards that evinced their consideration of all Parties' concerns and demonstrated their efforts to accurately identify the issues and resolve the Parties' disputes. "Arbitration law wisely relies upon the experience, perspective, understanding of industrial practice, and knowledge of logistics and economics, of the officer chosen as arbitrator." *Bhd. of Locomotive Eng'rs and Trainmen Gen. Comm. of Adjustment CSX Transp. N. Lines v. CSX Transp., Inc.,* 455 F.3d 313, 1316 (11th Cir. 2006).

LaRocco awarded 154 seniority numbers to the Eagle pilots to compensate for the 154 TWA-new-hire pilots who had already been recalled/attended training classes prior to entry of his opinion. LaRocco expressly declined to resolve the training-class issue because the Parties had stipulated that the sole issue before him was "seniority number generation". (Docket #80 Ex. 2 at 31.)

When formulating his remedy, Nicolau took into consideration the scope and content of LaRocco's ruling and adopted LaRocco's finding that the former-TWA pilots are "new hires" under the Flow-Through Agreement. Nicolau limited his ruling to the discrete issue of whether those Eagle pilots with AA seniority numbers were entitled to attend AA training classes beginning in June 2007, and if so, what remedy to award those Eagle pilots. Nicolau answered this question in the affirmative and awarded to the 244 most senior Eagle captains with AA seniority numbers the opportunity to transfer to American "in the same fashion as those CJ captains who previously transferred pursuant to the now expired Supplement W/Letter 3. . ." (Docket #145 at 1009.)

Both arbitrators recognized the training-class issue was left unresolved by LaRocco. Both arbitrators recognized the training class issue, if disputed, would have to be resolved through the filing of a separate grievance. These arbitrators issued awards that were designed to work in tandem with each other, not in conflict. Therefore, the Court rejects APA's argument that Nicolau exceeded his jurisdiction by awarding a double-remedy. Nicolau addressed the narrow issue before him and formulated a remedy that undoubtedly drew its essence from the collective bargaining agreement. The Nicolau remedy is not irrational and in no way attempts to fashion some new "brand of industrial justice." Thus, the Court rejects APA's argument that Nicolau exceeded his jurisdiction in deciding the issue(s) before him.

### ii) CBA Termination of Supplement W/Letter 3.

16

APA argues that despite the fact that the Flow-Through Agreement expired in May 2008, Nicolau's award improperly established a "new Supplement W/Letter 3 mechanism" for all Eagle pilots not already holding AA seniority numbers.

During the arbitration, Nicolau was asked to resolve the issue of "downstream damages". This issue concerned whether the Eagle pilots who were prevented from moving higher in Eagle's ranks because of the delay caused by the breach should be entitled to damages. ALPA argued that American should pay those damages because it decided to bring the TWA "new hire" pilots into the training classes rather than follow the precepts of Supplement W/Letter 3. American argued the damages were speculative and unjustified. American also contended the issue of downstream damages was not encompassed within the scope of the issue before the arbitrator, which was limited to whether Eagle pilots with AA seniority numbers were entitled to attend American training.

In his opinion, Nicolau addressed and resolved the downstream damages question, but elected not to award monetary damages due to the imprecise nature of such an award. Drawing from the essence of the collective bargaining agreement, Nicolau directed the Parties to enter into a preferential hiring agreement pursuant to which American would offer 824 Eagle captains one out of every two new hire positions in a new hire class in order of Eagle seniority "[w]hen job opportunities become available a[s] a result of future hiring at AA." (Docket #145 at 1006-07, 1010.)[8]

APA argues that Nicolau's award should be vacated because he crafted a remedy the Parties had explicitly agreed should not happen, as evidenced by their decision to terminate the Flow-

---

[8] At the time of the Nicolau ruling, there were 1351 Eagle captains – 527 had American seniority numbers and 824 did not. (Docket # 145 at 107.)

Through Agreement as of 2008. (Docket #144 at 27.) APA contends that Nicolau "ignored and contradicted clear terms of the parties' agreement." (Docket #144 at 27.)

When reviewing an arbitrator's award, the court cannot vacate the award "as long as the arbitrator's decision 'draws its essence from the collective bargaining agreement' and the arbitrator is not fashioning 'his own brand of industrial justice'." *Weber Aircraft Inc. v. Gen. Warehousemen and Helpers Union Local 767,* 253 F.3d 821, 824 (5th Cir. 2001); *see Teamsters Local No. 5. v. Formosa Plastics Corp.,* 363 F.3d 368, 371 (5th Cir. 2004). There is no doubt that Nicolau's decision on downstream damages draws its essence from Supplement W/Letter 3. APA acknowledges this by characterizing the award as a "Supplement W/Letter 3-like mechanism". (Docket #144 at 26.) Nor is Nicolau fashioning his own brand of industrial justice. Nicolau's decision is well-reasoned and consistent with the principles and policies that American and Eagle have been using for years to manage their relationship.[9]

### 3. Mistake of Facts.

APA argues Nicolau's remedy should be vacated because he misstated the positions the Parties took in the LaRocco proceeding when coming to his decision(s) on the issues of *res judicata*, election of remedies, and waiver. APA contends Nicolau erred by finding that "ALPA did not place before Arbitrator LaRocco a purported injury with respect to training classes," when in fact, ALPA and Eagle did argue for a remedy encompassing upcoming training classes. (Docket # 144 at 28-29;

---

[9] Using ALPA's logic, a monetary award would have been improper as well, because it would have contradicted the clear terms of the Parties' collective bargaining agreement, which did not provide for monetary compensation.

Docket # 145 at 980.)  APA argues that because Nicolau based his finding on a false premise, his ruling was "wholly baseless" and should be overturned.

The Supreme Court has recognized that "courts are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract." *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.,* 484 U.S. 29, 36 (1987). "The refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements. The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards." *Id.*

"To resolve disputes about the application of a collective-bargaining agreement, an arbitrator must find facts and a court may not reject those findings simply because it disagrees with them. The same is true of the arbitrator's interpretation of the contract. . . a court should not reject an award on the ground that the arbitrator misread the contract." *Id.* at 38.  As long as the arbitrator is even arguably acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision. *See id.*

Even if Nicolau mistakenly believed the issue of training class seats was not raised before LaRocco, the Court may not overturn his decision.  However, the Court does note that LaRocco expressly limited his ruling to the issue of seniority numbers because that was the issue stipulated by the Parties for determination. (Docket #145 at 606-07.)  Because his authority was limited to the seniority number issue, LaRocco expressly declined to resolve whether any flow-through AE pilots were entitled to seats in AA training classes. (Docket #145 at 607.)

For these reasons, the Court hereby DENIES APA's motion for summary judgment on its cross-claim and GRANTS the Movant Defendants' motion to dismiss.

It is SO ORDERED, this _____ day of August 2011.


JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE

## EXHIBIT A

### Supplement W/Letter 3

III.    Employment Opportunities at AA for AMR Eagle, Inc. Pilots

A.    At least one (1) out of every two (2) new hire positions per new hire class at AA will be offered to CJ Captains who are in line pilots and who have completed their IOE and AMR Eagle, Inc.  Such positions will be offered to the CJ Captains who are line pilots in order of their AMR Eagle, Inc. seniority.

B.    If a CJ Captain is unable to fill a new hire position at AA in accordance with Paragraph III.A. above, due to a training freeze or other operational constraint, (see Paragraph III.J. below), such CJ Captain will be placed on the AA Pilots Seniority List and will count toward the number of new hire positions.  The pilot's AA occupational seniority date and number will be established as if he were able to fill such new hire position at AA and had attended the new hire training class referenced in Paragraph III.A. above.  Such pilot's length of service for pay purposes, date of hire for pension purposes, and length of service for vacation accrual will be established in accordance with III.C. below.  The number of such CJ Captains will not exceed the difference between the number of CJ Captains who are able to fill new hire positions at AA and the number of new hire positions which must be offered to CJ Captains in accordance with Paragraph III.A. above.

C.    CJ Captain's (1) placement on the AA Pilots Seniority List (except as provided in Paragraph III.B. above which is only applicable for placement on the AA Pilots Seniority Listy in order to establish an AA occupational seniority date and number), (2) length of service for pay purposes, and (3) "date of hire" for pension purposes will be based on the date such pilot is entered on the AA payroll.  Such pilot's length of service for vacation accrual will be based on the cumulative total of the pilot's service at AMR Eagle, Inc. and AA.

D.    If a CJ Captain is placed on the AA Pilots Seniority List per III.B. above, such CJ Captain will receive priority based on his AA seniority in filling a new hire position in the next new hire class, following release from a training freeze or other AMR Eagle, Inc. imposed operational constraint. Such CJ Captains will not count toward the number of new hire positions offered to CJ Captains at AMR Eagle, Inc. under Paragraph III.A. above.

E.    Each of the first 125 AMR Eagle, Inc. pilots who successfully complete transition training as a CJ Captain must fulfill a training freeze for a period of eighteen (18) months from the date said pilot completes IOE.  All other pilots who successfully complete transition training as CJ Captains must fulfill a training freeze for a period of two (2) years from the date each pilot completes IOE, unless released from such

training freeze by AMR Eagle, Inc.

F.    An AMR Eagle, Inc. pilot may, not later than the completion of IOE for a CJ Captain position or at such time as the pilot is able to demonstrate hardship, elect to forfeit the opportunity to secure a position on the AA Pilots Seniority List as provided by this Supplemental Agreement. Such pilot will hereinafter be referred to as an "Eagle Rights CJ Captain," and will not be eligible for a future new hire position at AA which may otherwise become available under Paragraph III of this Supplemental Agreement. The existence of a hardship for this purpose shall be approved by the ALPA AMR Eagle MEC Chairman and the appropriate management official(s).

G.    A CJ Captain who is awarded a new hire position at AA will be issued the lowest seniority number at AA in the applicable new hire class, subject to AA's policy concerning the assignment of seniority numbers to new hire pilots who have previous service in other employee classifications. AMR Eagle, Inc. pilots will receive their AA seniority number in order of their seniority at AMR Eagle, Inc.

H.    A CJ Captain who accepts a new hire position at AA may be withheld from such position for operational reasons, provided the pilot is paid the greater of the rate of pay for the CJ Captain flying being performed at the applicable AMR Eagle, Inc pay rates, or the highest equipment rate of pay for the AA bid status from which withheld up to the applicable AA monthly maximum. Such withholding will be limited to a maximum of six months.

VII.    Duration

A.    This Supplemental Agreement shall be effective on sighing and shall continue in full force and effect through the later of:

1.    The amendable date of the next ensuing Basic Agreement between AA and APA.

2.    Ten (10) years from the date of this Supplemental Agreement, at which time this Supplemental Agreement shall become null, void and of no further force and effect.